**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**DELVIN JAMES WILSON,**

Petitioner,

v. Civil Action No. **3:19CV657**

**HAROLD W. CLARKE,**

Respondent.

**MEMORANDUM OPINION**

Delvin James Wilson, a Virginia state prisoner proceeding *pro se*, brings this petition pursuant to 28 U.S.C. § 2254 (ECF No. 5) challenging his convictions in the Circuit Court of Hampton, Virginia (the "Circuit Court"). Wilson demands relief on the following grounds:

Claim One: "Sixth Amendment [V]iolation – Ineffective assistance of [appellate] counsel for failing to raise . . . the involuntariness of [Wilson's] plea on appeal." (ECF No. 5, at 5.)[1]

Claim Two: "Ineffective assistance of counsel," "coercion" of counsel, "duress" from the Commonwealth's Attorney, and a lack of understanding caused Wilson to "ma[k]e pleas that were not knowing[], voluntar[y], or intelligent," and resulted in a "denial of due process." (*Id.* at 7.)

Claim Three: "Sixth Amendment – [I]neffective assistance of counsel for failing to show evidence of defense at motion to withdraw hearing." (*Id.* at 8.)

Claim Four: "Sixth Amendment – I[neffective] A[ssistance] [of] C[ounsel] for failing to cross-examine witnesses and making prejudicial statements of crime." (*Id.* at 10.)

Claim Five: "Fourteenth Amendment – Denial of Due Process because of a Brady[2] violation." (*Id.* at 12.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the spelling, spacing, punctuation, and capitalization in the quotations from Wilson's submissions.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

Claim Six: "Fourteenth Amendment Violation – Due Process for not giving adequate means to raise issue of sanity and challeng[e] adverse conclusion." (*Id.* at 13.)

Claim Seven: "Sixth Amendment Violation – Counsel waive[d] jury trial without my consent." (*Id.* at 15.)

Respondent answers and moves to dismiss, *inter alia*, on the ground that Wilson's claims were procedurally defaulted. Wilson filed a reply. (ECF No. 17.) For the reasons stated below, the Motion to Dismiss (ECF No. 12) will be GRANTED.

## I. PROCEDURAL HISTORY

On December 31, 2014, following an argument in their home, Wilson shot his wife several times causing her permanent injury, including permanent scars and loss of function in her right arm and hand.[3] (VCAR at 70, n.3; VSCR at 48.)[4] Prior to trial, a mental health evaluation was ordered, and by May, 2015, Wilson was found competent to stand trial. (VCAR at 69, n.1.) On January 14, 2016, the day before he was scheduled to stand trial, Wilson requested a second mental health evaluation. (*Id.* at 69.) After the trial court denied that request, Wilson entered guilty pleas to Aggravated Malicious Wounding, Use of a Firearm in a Felony, and Discharge of a Firearm in an Occupied Dwelling. (*Id.*) At that time, the Commonwealth dropped a fourth charge for being a Felon in Possession of a Firearm. (*Id.* at 69, n.2.)

---

[3] Wilson does not dispute that he shot his wife. (ECF No. 6, at 16–17). Indeed, in his memorandum in support of his § 2254 Petition, he says, "I was full of hot-blooded rage when . . . I came into our kitchen firing a gun," and shooting his wife, because, he maintains, she had just told him she was "sleeping with another man." (*Id.* at 17.)

[4] The Virginia Court of Appeals provided a paginated record for *Wilson v. Commonwealth*, No. 0830–17–1. The Virginia Supreme Court provided a consolidated and paginated record for *Wilson v. Commonwealth*, No. 180489, and *Wilson v. Clarke*, No. 190216. References to the Virginia Court of Appeals Record will be denoted by "VCAR," and references to the Virginia Supreme Court Record will be denoted by "VSCR." The Court will adopt the pagination from the VCAR and VSCR, respectively.

During his plea colloquy, Wilson indicated to the Circuit Court that he:

1. was thirty-seven years old and had a GED (ECF No. 14–8, at 7);
2. was the person charged in the indictments that were read to him (*id.*);
3. fully understood the charges against him (*id.* at 7–8);
4. had discussed the charges and the elements with his attorney (*id.* at 8);
5. understood what the state had to prove before he could be found guilty (*id.*);
6. had enough time to discuss any possible defenses with his attorney (*id.*);
7. discussed how he should plead with his attorney (*i.e.*, guilty or not guilty) (*id.*);
8. decided for himself that he should plead guilty (*id.*);
9. entered his pleas freely and voluntarily (*id.* at 8–9);
10. was pleading guilty because he was "in fact" guilty (*id.* at 9);
11. knew he was giving up a jury trial (*id.*);
12. knew he was giving up the right to remain silent (*id.*);
13. knew he was giving up the right to confront and cross-examine his accusers (*id.*);
14. knew he was giving up the right to defend himself against the charges (*id.*);
15. had not been threatened or promised anything concerning his pleas (*id.*);
16. understood he could receive a sentence of twenty years to life for the aggravated malicious wounding charge (*id.* at 10–11);
17. understood he could receive a sentence of two to ten years for the shooting in an occupied dwelling charge (*id.* at 11);
18. understood he would receive a "mandatory" three-year sentence for the use of a firearm in a felony charge (*id.*);
19. understood there was no parole in Virginia (*id.*);
20. was "entirely satisfied with the services of [his] lawyer (*id.* at 11–12); and,
21. understood that he was waiving appellate rights by pleading guilty (*id.* at 12).

Prior to accepting Wilson's guilty pleas, the Court asked the Commonwealth to summarize the evidence against Wilson. The Commonwealth's attorney stated:

> "[On] December 31st of 2014, Jacqueline Wilson was preparing to go out to celebrate New Years with some friends. She and [Wilson] had been arguing for most of the day and [Wilson] had been drinking for most of the day. Mrs. Wilson was sitting at the kitchen table fixing her hair when she overheard [Wilson] yelling at her children in the living room. She ran into the living room and told [Wilson] not to yell at her children and told them to get dressed so they could leave the home for the evening. Mrs. Wilson returned to the kitchen table. While [she] was sitting there [Wilson] walked into the kitchen and began shooting her with a .380 [caliber] firearm. [Wilson] fired all of the bullets in the gun striking Ms. Wilson in various parts of her body. All three of Mrs. Wilson's children were present inside of the home during the shooting. As a result of the shooting Mrs. Wilson has undergone multiple surgeries and is currently involved with occupational therapy for an indefinite period of time. She has suffered permanent scars and bruising and no longer has full functionality of her right arm and hand . . . . [Wilson] had previously been convicted of a felony . . . in 2002.

(*Id.* at 12–13 (alterations in spacing).) Wilson acknowledged that the Commonwealth's evidence would have been sufficient to convict him if he had gone to trial. (ECF No. 14–7, at 5.) Following the plea colloquy, the Circuit Court accepted Wilson's pleas, found him guilty of the three offenses to which he had pled, and continued the matter for sentencing. (VCAR at 10, 70.)

Following his convictions, but before he was sentenced, Wilson filed motions, both *pro se*, and through counsel, seeking to withdraw his guilty pleas. (*Id.* at 70.) On April 28, 2016, a hearing was held on the issue, at which Wilson testified. (*Id.*) Following the hearing, the Circuit Court rejected Wilson's claims and denied his motion to withdraw his guilty pleas. (*Id.* at 9, 70.) On June 20, 2016, Wilson returned to the Circuit Court, at which time, he was sentenced to twenty-five years of active incarceration. (*Id.* at 10–11.) Wilson appealed. (*Id.* at 12–14, 17.)

On direct appeal, Wilson argued that the Circuit Court had erred by: 1) denying his request for a second mental health evaluation; and 2) denying his motion to withdraw his guilty pleas. (*Id.* at 13.) The Court of Appeals of Virginia denied Wilson's petition for appeal. (*Id.* at 12–14.) The Court addressed the merits of Wilson's argument concerning his request for a second mental health evaluation and found it to be lacking. (*Id.* at 13–14.) The Court, however, did not address the merits of his argument concerning the withdrawal of his guilty pleas, finding instead that the record was insufficient because Wilson had failed to provide a necessary transcript. (*Id.* at 13.)

Wilson, through his attorney, requested leave "to file the proper transcripts so [that] his assignment of error relating to his motion to withdraw his guilty plea may be considered on the merits." (*Id.* at 3.) The Court of Appeals granted Wilson leave to file a replacement notice of appeal, which he subsequently did. (*Id.* at 16, 17.) Wilson's attorney filed a new brief on the issue. (*Id.* at 18–33.) Wilson, acting *pro se*, also filed his own "amended" brief to supplement his attorney's brief. (*Id.* at 39–54.)

On December 29, 2017, the Court of Appeals issued a *per curiam* order denying Wilson's petition for appeal. (*Id.* at 69–73.) The Court of Appeals determined that the Circuit Court had not erred when it denied Wilson's motion to withdraw his guilty pleas because Wilson had not met his burden of showing that the motion was made in good faith, and was not merely dilatory, and because he had failed to proffer "any evidence of a reasonable basis for contesting guilty." (*Id.* at 72.) The Court pointed out that in both his *pro se* filings, and in the filings presented by his attorney, Wilson failed to attach any affidavits or point to any other specific piece of evidence to support his position. (*Id.* at 72, n.5.) Wilson's "bare assertion," that he had shot his wife while in the heat of passion, as opposed to with malice, was insufficient, the Court reasoned, to satisfy his burden and allow him to withdraw his guilty plea. (*Id.*)

Wilson filed a demand for a three-judge review. (*Id.* at 74 – 76.) On April 9, 2018, a three-judge panel denied Wilson's petition for appeal for the reasons stated in the December 29, 2017 *per curiam* order. (*Id.* at 80.) Wilson appealed to the Supreme Court of Virginia. (*Id.* at 81.) In his Petition for Appeal, Wilson raised one assignment of error concerning the denial of his motion to withdraw his guilty plea.[5] (VSCR at 116.) On August 23, 2018, the Supreme Court of Virginia refused his petition for appeal. (*Id.* at 127.)

---

[5] Specifically, Wilson argued that the "Court of Appeals erred in affirming the trial court's denial of Wilson's motion to withdraw his guilty pleas, where Wilson alleged he entered pleas of guilty without having sufficient time to consult with his attorney or review the evidence against him." (VSCR at 116.) Wilson, apparently cognizant of the fact that this assignment of error did not attack the validity of plea itself, but rather only the subsequent decision to deny his motion to withdraw his plea, now maintains that sometime prior to filing his direct appeal, he asked his attorney to overtly attack the "involuntariness of [his] guilty plea on appeal." (ECF No. 5, at 5.) His attorney, however, did not do that; a decision Wilson maintains was "incorrect." (*Id.* at 5, 7.) Wilson maintains that decision is the reason why he did not raise, *inter alia*, the due process issues touched on in Claims One and Two on direct appeal. (*Id.*) In his Petition, Wilson seems to concede that his failure to include these issues on appeal contributed to his procedural default. (*Id.* at 5 ("This caused my claim to be procedurally defaulted . . . .").) The issue of whether and how Wilson may have defaulted his claims will be addressed in greater detail in Section II, *infra*.

On or about November 1, 2018, Wilson filed a petition for a writ of habeas corpus in the Circuit Court. (*Id.* at 41–45.) Wilson raised six claims. (*Id.* at 43.) As stated in his memorandum in support, the claims were as follows:

Claim One: "[Counsel] provided ineffective representation when he failed to raise the involuntariness of Mr. Wilson's guilty plea on appeal." (*Id.* at 47, 52.)

Claim Two: "Ineffective assistance of counsel," "coercion," "duress," and a lack of understanding caused Wilson to enter a guilty plea that "was not knowing[], voluntar[y], or intelligent," and violated his "rights of the Due Process Clause." (*Id.* at 47, 57.)

Claim Three: "[Counsel] provided constitutionally ineffective assistance [by] . . . A.) fail[ing] to produce affirmative evidence of a reasonable defense at Mr. Wilson's motion to withdraw his guilty plea hearing . . . B.) fail[ing] to cross-examine witnesses at Mr. Wilson's sentencing hearing and m[aking] prejudicial statements about Mr. Wilson's offense during his sentencing hearing." (*Id.* at 47, 75, 80.)

Claim Four: "The Commonwealth Attorney committed a Brady Violation when they failed to turn over material evidence to Mr. Wilson violating his Due Process." (*Id.* at 47, 85.)

Claim Five: "Mr. Wilson's Due Process was violated when the Circuit Court Judge denied Mr. Wilson the opportunity to challenge the adverse conclusion of his sanity at the time of offense report and to provide adequate means to raise the issue of his insanity." (*Id.* at 48, 91.)

Claim Six: "[Counsel] committed reversible error when he waived Mr. Wilson's right to a jury trial without his consent and informed him that he had to take a bench trial." (*Id.* at 48, 95.)[6]

On December 18, 2018, the Circuit Court denied Wilson's state habeas corpus petition. (VSCR at 99–100.) Among other things, the Circuit Court made the following finding of fact:

---

[6] Wilson appears to have been represented by three different attorneys at various points throughout his state court proceedings. (VSCR at 49–50.) Nanita Cornish appears to have been his first attorney. (*Id.* at 49.) Wilson filed a *pro se* motion for new counsel, after which he was represented by Tyrone C. Johnson. (*Id.*) Johnson was eventually replaced by Joshua A. Goff. (*Id.* at 50.) While Wilson from time-to-time assigns error to his various attorneys by name, the Court will refer to his attorney(s) generically as "counsel," where possible.

> Pursuant to the trial Court's colloquy with the Petitioner at trial, he indicated that he had discussed the charges and any possible defenses with his attorney, was satisfied with the services of his counsel, and that his plea was knowingly, intelligently and voluntarily entered, all while knowing the maximum punishment for these charges.

(*Id.* at 100.) Wilson appealed the Circuit Court's denial of his habeas petition. (*Id.* at 22.)

In his petition for appeal to the Supreme Court of Virginia, Wilson made three assignments of error:

Assignment of Error One: "The habeas court erred in sua sponte making findings of facts to the grounds presented in the habeas petition regarding issues not made evident in the record without first allowing the respondent to respond." (*Id.* at 9.)

Assignment of Error Two: "The habeas court's actions in sua sponte dismissing the habeas petition[] amounted to an unconstitutional suspension of the writ." (*Id.*)

Assignment of Error Three: "The habeas court erred in failing to conduct an evidentiary hearing prior to its decision as material facts were in dispute that could not have been resolved by a review of the record alone." (*Id.*)

Wilson did not include any assignments of error specifically addressing the denial of state habeas Claims One through Six.[7] (*Id.*)

On July 3, 2019, The Supreme Court of Virginia refused Wilson's petition for appeal. (*Id.* at 107.) Wilson subsequently filed the § 2254 Petition that is now before the Court. (ECF No. 5.)

---

[7] The Court notes that there are substantial similarities between the six claims made in Wilson's initial state habeas petition in the Circuit Court (*cf.* VSCR at 47, 48, 52, 57, 75, 80, 85, 91, 95), and the seven claims contained in his § 2254 Petition presently before this Court (*accord* ECF No. 5, at 5, 7, 8, 10, 12, 13, 15). The most appreciable difference between the two sets of claims is that in his § 2254 Petition, Wilson appears to have separated his state habeas Claim Three A and B into two stand-alone claims (Claims Three and Four, respectively), thus, turning six state habeas claims into seven federal claims. (*Compare* VSCR at 47, 75, 80, *with* ECF No. 5, at 8, 10.) Respondent seems to believe that the claims raised before this Court are "the same" as those raised in Wilson's initial state habeas petition before the Circuit Court. (ECF No. 14, at 6.) Going forward, the Court will assume, *arguendo*, that the habeas claims initially raised before the Circuit Court are roughly the equivalent of Wilson's current claims presently before this Court.

## II. EXHAUSTION AND PROCEDURAL DEFAULT

Respondent argues that this Court cannot consider Wilson's current claims and must dismiss them because Wilson "failed to raise his claims on the appeal of his state habeas [petition] to the Supreme Court of Virginia." (ECF No. 14, at 5.) Following the denial of his state habeas petition by the Circuit Court, Respondent contends, "Wilson only advanced . . . procedural errors on appeal," to the Supreme Court of Virginia, rather than "address[ing] the merits of the circuit court's findings." (*Id.* at 6.) For the reasons stated below, Respondent is correct.

Before a state prisoner can bring a § 2254 petition in federal district court, the prisoner must first have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). State exhaustion "is rooted in considerations of federal-state comity," and in Congressional determination via federal habeas laws "that exhaustion of adequate state remedies will 'best serve the policies of federalism.'" *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (some internal quotation marks omitted) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 492 n.10 (1973)). The purpose of exhaustion is "to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks omitted).

Exhaustion has two aspects. First, a petitioner must utilize all available state remedies before the petitioner can apply for federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–48 (1999). As to whether a petitioner has used all available state remedies, the statute notes that a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The second aspect of exhaustion requires a petitioner to have offered the state courts an adequate "opportunity" to address the constitutional claims advanced on federal habeas. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks omitted) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* Fair presentation demands that a petitioner present "both the operative facts and the controlling legal principles" to the state court. *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner. *Mallory v. Smith*, 27 F.3d 991, 994–95 (4th Cir. 1994).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). This doctrine provides that "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). A federal habeas petitioner also procedurally defaults claims when he or she "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Id.* (quoting *Coleman*, 501 U.S. at 735 n.1).[8]

[8] Under these circumstances, even though the claim has not been fairly presented to the Supreme Court of Virginia, the exhaustion requirement is "technically met." *Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)).

The burden of pleading and proving that a claim is procedurally defaulted rests with the state. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) (citations omitted). Once such a showing has been made, this Court cannot review the merits of a defaulted claim absent a showing of "cause for the default and actual prejudice as a result of the alleged violation of federal law," or a showing that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *see Harris v. Reed*, 489 U.S. 255, 262 (1989).

To exhaust his current claims, Wilson was required to properly present them to the Supreme Court of Virginia prior to filing his § 2254 Petition. This did not occur. While Wilson did present claims to the Circuit Court that appear to be roughly equivalent to the claims that are presently before this Court, *see* n.7, *supra*, those claims never matriculated to the Supreme Court of Virginia for consideration because Wilson did not specifically include them in his state habeas appeal.[9] (*Cf. ante* at 6–7.) Consequently, the Supreme Court of Virginia was denied a fair and meaningful "opportunity" to address the constitutional claims that Wilson currently seeks to advance. *Baldwin*, 541 U.S. at 29.

Wilson essentially concedes this point in his response to Respondent's motion to dismiss when he admits that, "maybe [he] did not properly address the merits of the circuit court's

---

[9] Virginia Supreme Court Rule 5:17 instructs parties on the requirements for filing a Petition for Appeal. Subsection (c) sets out "[w]hat the Petition [m]ust [contain," including assignments of error. *See* Sup. Ct. Va. Rule 5:17(c)(1). Under an enumerated heading, the appellant "clearly and concisely and without extraneous argument," must list "the specific errors in the rulings below." *Id.* "Only assignments of error assigned in the petition for appeal will be noticed by [the Virginia Supreme] Court." Sup. Ct. Va. Rule 5:17(c)(1)(i). If a petition "does not contain assignments of error," it "shall be dismissed." *Id.* "[I]n presenting an assignment of error," to the Virginia Supreme Court, an appellant "must lay his finger on the error in the trial record." *Friedline v. Commonwealth*, 576 S.E.2d 491, 494 (Va. 2003) (internal quotation marks omitted) (citing *Kirby v. Commonwealth*, 570 S.E.2d 832, 834 (Va. 2002); *First Nat'l Bank of Richmond v. William R. Trigg Co.*, 56 S.E. 158, 163 (Va. 1907)). *Accord Mueller v. Angelone*, 181 F.3d 557, 582 (1999) (Rule 5:17(c) constitutes an independent and adequate grounds for dismissal in a habeas corpus review).

finding[s] on appeal."[10] (ECF No. 17, at 2.) Wilson requests that his petition be "dismissed without prejudice," so that he may have an opportunity "to go back to the state court to exhaust [his] claims." (*Id.* at 3.) "[O]nce [his] claims are exhausted," Wilson further requests that he "be allowed to resubmit his [§ 2254] petition in federal court." (*Id.*) Unfortunately for Wilson, the Supreme Court of Virginia, "the court to which [Wilson] would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Breard*, 134 F.3d at 619 (quoting *Coleman*, 501 U.S. at 735 n.1).

Section 8.01–654(B)(2) of the Virginia Code prohibits the filing of successive habeas corpus petitions where the underlying facts of the petition were known to the petitioner "at the time of filing any previous petition." Va. Code Ann. § 8.01-654(B)(2) (West 2020). Because Wilson presented six claims to the Circuit Court that were roughly equivalent to the seven claims that are currently included in his federal petition, prior to his habeas appeal to the Supreme Court of Virginia, where he appealed an entirely different set of issues, it is obvious that the facts underlying his current claims were known to Wilson prior to his habeas appeal to the Supreme Court of Virginia, and any new state habeas petition in the Supreme Court of Virginia seeking to exhaust Wilson's current seven claims, would be barred as successive. *Accord Breard*, 134 F.3d

---

[10] Wilson points to the "CONCLUSION" section of his Petition for Appeal to the Supreme Court of Virginia, where he wrote "I am asking this Honorable Court to . . . GRANT the relief requested in the [Circuit Court] habeas petition," as evidence that he "did attempt to present these issues to the Supreme Court." (ECF No. 17, at 3; *see also* ECF No. 14–5, at 19.) Attempts notwithstanding, neither this vague passage, nor any of the general statements Wilson made in his petition for appeal about the performance of his attorneys, or otherwise, sufficed to "lay his finger on" any particular "error in the trial record," *vis a vis* state habeas Claims One through Six, *see Friedline*, 576 S.E.2d at 494 (citations omitted), or explain why compliance with Rule 5:17(c)(1) is not required, *see* Rule 5:17(c)(1)(i) ("[o]nly assignments of assigned in the petition for appeal will be noticed by this Court).

at 619–20 (citing Va. Code § 8.01–654(B)(2) as basis for determining that unexhausted claims were procedurally defaulted).[11]

Thus, the question becomes whether Wilson has shown "cause for the default and actual prejudice," or that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Harris*, 489 U.S. at 262. This Court may not consider Wilson's claims if he fails to make such a showing.

Addressing the "cause" prong of the "cause and prejudice" analysis, Wilson posits that he "did attempt to present these claims to the Supreme Court." (ECF No. 17, at 3.) Wilson, however, maintains that he was ultimately unsuccessful in doing so because neither he, nor the prison law library clerk (another inmate) who was helping him "are appellate attorneys." (*Id.* at 2–3.)

To establish "cause" to excuse a procedural default, a petitioner must point to "something external to the petitioner," which "cannot fairly be attributed to the petitioner," which "impeded" his "efforts to comply with the state's procedural rule." *Coleman, supra*, at 743. Generally, neither "negligence," nor "ignorance or inadvertence in a postconviction proceeding" qualifies "as cause to excuse a procedural default." *Martinez v. Ryan*, 566 U.S. 1, 9–10, 15–16 (2012) (discussing the "rule of *Coleman*," which "governs in all but [] limited circumstances"). As Wilson is essentially claiming ignorance of the law as "good cause" to excuse his failure to properly present his claims to the Supreme Court of Virginia on appeal following the denial of his state habeas petition in Circuit Court, the Court must apply the rule of *Coleman*, unless Wilson can demonstrate an exception applies.

---

[11] Several of Wilson's claims also appear to be barred by the rule in *Slayton v. Parrigan*, 205 S.E.2d 680, 682 (Va. 1974), because Wilson could have raised, but failed to raise, those issues on direct appeal. *See Clagett v. Angelone*, 209 F.3d 370, 379 (4th Cir. 2000) (*Slayton* constitutes an adequate and independent procedural rule when so applied); *Mu'Min v. Pruett*, 125 F.3d 192, 196–97 (4th Cir. 1997).

A "narrow exception" to the rule of *Coleman* applies for "claim[s] of ineffective assistance at trial," where such claims "must be raised in an initial-review collateral proceeding," and at such "initial-review collateral proceeding," there was "no counsel," or only "ineffective counsel." *Id.* at 9, 17. This "narrow exception," however, does not extend to "appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Id.* at 16. Unfortunately for Wilson, his claims do not fall within this narrow exception.

The procedural default in this instance did not occur at Wilson's initial-review collateral proceeding. Rather, the default occurred on his appeal from his initial-review collateral proceeding before the Circuit Court, when he failed to properly appeal the issues raised at his initial-review collateral proceeding to the Supreme Court of Virginia in accordance with Virginia's "chosen procedural scheme," as he was required to do under *Mallory, supra*. When Wilson appealed issues to the Supreme Court of Virginia that were different than the issues that he presented at his initial-review collateral proceeding before the Circuit Court, he deprived the Supreme Court of Virginia of an "opportunity" to address those claims. *See Baldwin, supra*.

As such, the rule of *Coleman* applies, and Wilson's ignorance of the law cannot suffice to excuse his procedural default. As Wilson points to no other external factors that impeded his ability to properly present his case to the Supreme Court of Virginia, he has failed to establish the "cause" portion of the "cause and prejudice" analysis. *See Atkins v. Holloway*, 792 F.3d 654, 661 (6th Cir. 2015) (finding no "cause" where "default occurred . . . after [petitioner] failed to appeal [the] denial[] [of his claims]"); *see also Johnson v. Warden of Broad River Corr. Inst.*, No. 12–7270, 2013 WL 856731, at *1 (4th Cir. Mar. 8, 2013) (noting that failure to preserve ineffective assistance claim on appeal from denial of postconviction petition did not constitute "cause");

*Khavkin v. Clarke*, No. 3:16CV576, 2019 WL 1590582, at *9–10 (E.D. Va. Apr. 12, 2019) (failure to raise issue before Supreme Court of Virginia on appeal of denial of state habeas petition not "cause" to excuse procedural default).

In this instance, the "prejudice" prong is similarly lacking. The main thrust of Wilson's argument seems to be that if he were allowed to withdraw his guilty pleas, he would have ultimately been convicted of lesser charges, or potentially acquitted of some charges, as he believes that he would have been able to negate the malice element of the aggravated malicious wounding charge, thereby reducing his criminal culpability. This belief seems to be rooted in the notion that Wilson would have been able to elicit evidence at trial, either by testifying, or potentially by cross-examining his wife, that prior to him shooting her, she had told him that she was sleeping with another man, and told her children in his presence, that they did not need to listen to him because he would be out of their home soon. (ECF No. 6, at 16–18.) Wilson says that he "never knew or suspected [his] wife's infidelity until she said this in the midst of us arguing," which he maintains "brought to [him] furor brevis which rendered [him] deaf to the voice of reason." (*Id.* at 17.) Wilson does not contest shooting his wife. (*Id.* ("I was full of hot-blooded rage when . . . I came into our kitchen firing a gun . . . [and] she was struck").) Wilson misunderstands the law of malice as it is applied in Virginia.

Virginia follows the common law principle that "words alone are not sufficient to engender a reasonable provocation that incites passion and negates the presence of malice." *Smith v. Commonwealth*, 808 S.E.2d 848, 854 (Va. Ct. App. 2018) (citations omitted), *aff'd*, 821 S.E.2d 543 (Va. 2018). Given the state of the law in Virginia and given the fact that Wilson has offered nothing to support his putative "heat of passion" defense, aside from the statements he attributes to his wife, which may or may not have been disputed at trial, Wilson would not be entitled to a

jury instruction for "heat of passion," or "provocation." As such, he has shown no prejudice in this regard.

Wilson also half-heartedly argues that if he were allowed to withdraw his guilty plea, his attorney could have argued that he lacked malicious intent when he shot his wife because he was "recklessly firing the gun from hot-blooded rage." (ECF No. 6, at 18.) To the extent Wilson views this as a separate argument from his "heat of passion" defense, it is similarly deficient. It is well–established in Virginia that a "finder of fact may infer that a person intends the natural and probable consequences of his acts." *Campbell v. Commonwealth*, 405 S.E.2d 1, 4 (Va. Ct. App. 1991) (citation omitted). In this instance, after drinking and arguing most of the day with his wife, who appeared to be going out with friends for New Year's without him, and following immediately on the heels of an altercation where she chastised him for yelling at her children, Wilson picked up a gun, entered a room where his wife was seated and doing her hair, and fired it at her until he ran out of bullets, striking her multiple times in various parts of her body, all while her three children were in the home. (ECF No. 14–8, at 12–13.) The natural and probable consequences of firing all the bullets in a gun at a person in a close-quarters, confined space, inside a home, are that said person would be shot by one or more of those bullets. Given that is precisely what happened in this instance, it would not be a great leap for a finder of fact to presume that Wilson intended exactly those consequences when he fired the gun.

To rebut this presumption, Wilson almost certainly would have had to testify, as he indicated he would do in his filings with this Court. (ECF No. 6, at 17.) In so doing, he would subject himself to cross-examination and impeachment for, among other things, his felony record. He would necessarily have had to admit to being a felon in possession of a firearm, a charge which the Commonwealth dropped when he entered his three guilty pleas. In so doing, he would subject

himself to an additional conviction and potentially to a longer period of incarceration. Aside from being impeached by his record, Wilson could also be questioned about any alcohol or illicit substances that he had used prior to the shooting, as that would bear on his ability to perceive and recall the events of that day. He would also potentially expose himself to cross-examination on prior instances of domestic turbulence, or possibly other prior bad acts, to the extent they could be shown to have some bearing on his motive, his intent, or whether he made a mistake when he shot his wife. Not to overlook the obvious, but if the jury were to credit Wilson's testimony that he had just learned his wife was sleeping with another man, which apparently would not have come into the record unless Wilson himself introduced it, the jury would be free to view that as a motive for him to be angry at his wife and want to do her harm. Since he would not be entitled to a heat of passion argument, as discussed above, Wilson would run the risk of providing the jury with a motive for his actions above and beyond simple marital discord that they may not otherwise have known about. In any event, these are just a few of the most obvious perils Wilson would have faced had he taken the stand.

Even under light cross-examination from a novice prosecutor, the chances of Wilson convincing a jury that he did not intend the natural and probable consequences of his actions (i.e., that his wife be shot multiple times where he emptied his gun in her direction in a close-quarters, confined space, immediately following a heated argument with her, after a day of drinking and fighting), would be infinitesimal. Quite to the contrary, had Wilson been allowed to withdraw his guilty pleas and proceed to trial by jury, in all likelihood, he would have been convicted of an additional offense (the felon in possession of a firearm charge that was dropped) and likely faced additional incarceration. As such, Wilson has again failed to show prejudice.

In his response to the Respondent's Motion to Dismiss Wilson includes a section entitled "Fundamental Miscarriage of Justice." (ECF No. 17, at 16–17 (emphasis omitted).) In this section, however, Wilson simply rehashes his earlier statements relating to the "cause" prong of the "cause and prejudice" analysis. (*Id.*) He reiterates that his state habeas claims were defaulted on appeal to the Supreme Court of Virginia due to a "small mistake by the law library clerk telling [him] that all [he] ha[d] to do [wa]s send [his] habeas corpus [petition] along with the exhibits," which would "allow the Supreme Court to review [his] claims." (*Id.*) As discussed above, this was considerably more than a "small mistake."

Wilson does not dispute that he shot his wife. He does not dispute that he fired every bullet in his gun in her direction in a close-quarters, confined area, after drinking and fighting with her all day. He does not dispute that she suffered permanent impairment and loss of function in her hand and arm. He does not dispute that he was a felon at the time and should have never been in possession of a firearm in the first place. He pled guilty with the assistance of counsel (one of three attorneys that represented him throughout trial and sentencing). He was asked appropriate questions by the Circuit Court and gave appropriate answers. Importantly, he said that he understood the charges against him, the elements of those charges, and what the Commonwealth would have to prove to convict him. He said he had enough time to discuss possible defenses with his attorney and indicated that he had in fact discussed his decision to plead guilty or not guilty with his attorney. He told the Court it was his decision to plead guilty because he was in fact guilty. He demonstrated that he understood the range of sentences he faced and indicated that he understood the rights he was giving up by pleading guilty (jury, confront accuser, appeal, etc.). He expressly told the Court that his pleas were freely and voluntarily made. Notably, he also stated that he was "entirely satisfied" with his attorney. Under these circumstances, Wilson has failed to

establish that a fundamental miscarriage of justice would result if this Court did not consider his procedurally defaulted claims.

Given Wilson's inability to establish "cause and prejudice," or that a "fundamental miscarriage of justice" would occur if this Court declined to consider his procedurally defaulted claims, Wilson's current federal Claims One through Seven will be DISMISSED.

## III. CONCLUSION

For the foregoing reasons, Respondent's Motion to Dismiss (ECF No. 12) will be GRANTED. Wilson's § 2254 Petition (ECF No. 5) will be DENIED. The action will be DISMISSED. The Motion for an Evidentiary Hearing (ECF No. 18) will be DENIED.

An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & 4 (1983)). Wilson fails to meet this standard. A certificate of appealability will be DENIED.

The Clerk is directed to send a copy of the Memorandum Opinion to Wilson and counsel for the Respondent.

It is so ORDERED.

Date: 12 August 2020
Richmond, Virginia

/s/
John A. Gibney, Jr.
United States District Judge